UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF INDIANA, | )<br>)<br>) |
| Plaintiffs, | )<br>) NO. 2:14CV312-PPS/PRC |
| v. | )<br>) |
| ATLANTIC RICHFIELD COMPANY and E.I. DU PONT DE NEMOURS AND COMPANY, | )<br>)<br>)<br>) |
| Defendants. | |

**OPINION AND ORDER**

This case concerns the Environmental Protection Agency's longstanding efforts to clean up a number of residential areas of East Chicago, Indiana that, for decades, have been known to be polluted by the defendants, Atlantic Richfield Company and E.I. Du Pont De Nemours and Company. In the fall of 2014, the United States and the State of Indiana brought this action and simultaneously filed a Consent Decree. After holding a hearing on the proposed decree, I decided that it was fair and reasonable, approved the Consent Decree and promptly closed the case. Two years went by, and work began on the clean up of the affected areas. But somewhere along the way, a group of citizens became understandably frustrated with the lack of progress being made by the EPA. This frustration was borne out of the news that some citizens would have to evacuate their homes due to contamination levels more severe than previously thought.

Those citizens, along with a community group they have formed, sought to intervene in this lawsuit. The matter was initially handled by Magistrate Judge Cherry who denied the motion to intervene as untimely since it came more than two years after the case was closed. The would-be intervenors now seek review of Judge Cherry's decision. While I am sympathetic to the concerns of the citizens who seek better action from their government, and particularly from the EPA, ultimately, I agree with Judge Cherry. Intervention in a case that has been closed for two years, and where there are settled expectations by the parties, strikes me as a dubious proposition. So I will affirm Judge Cherry's decision and therefore deny the motion to intervene.

## Background

It is not hyperbole to say that this case involves nothing short of an environmental catastrophe. The history of the case is lengthy and complicated. For our purposes, the relevant part of the story begins in 2009, when residential areas in East Chicago, Indiana were added to what's known as the Superfund's National Priorities List, signaling that the area was contaminated and that the contamination posed a risk to residents' health. There are two affected areas: the EPA gives them the monikers "OU-1" and "OU-2." OU-1 is in turn divided into three zones. Zone 1 has a large housing project (soon to be razed) and a now shuttered elementary school in it. Zones 2 and 3 are primarily residential neighborhoods with single family homes and thousands of residents. Appended to this Opinion is a map of the affected area. [*See also* DE 50-5 at 2.]

For reasons that are not entirely clear to me, this case only involves Zone 1 and Zone 3 of OU-1. Zone 2 of OU-1 and the entirety of OU-2 are simply not part of this case. I was told at oral argument that the clean up of those areas is being handled through an EPA administrative process that is somewhat opaque to me. *[See* DE 53 at 35-36.] I further was told that Zone 2 was left out of this case and the resulting Consent Decree because "of the time-critical nature of some of the work" to be done there. [*Id.* at 36.] I'm not quite sure what that means. I would think all of the work is "time-critical." The bottom line is that the remedial work being contemplated or actually done in Zone 2 is simply not part of this case.

In any event, the placement of the affected areas on the National Priorities List triggered the EPA's duty to investigate, select, and execute a remediation plan for the area under the Comprehensive Environmental Response, Compensation, and Liability Act, commonly referred to as "CERCLA." 42 U.S.C. § 9601 et. seq. In this case, the EPA refers to the affected area of East Chicago as the "USS Lead Superfund Site." I'll just refer to it as the Site.

After placing the Site on the National Priorities List in 2009, three years went by. Finally, in November 2012, the EPA announced its proposed plan for the cleanup of the Site and invited the public to comment on the proposed plan – for a period of 60 days – before the final remedy was selected. The EPA also held a public meeting on July 25, 2012 to discuss the cleanup process. After all the study, and taking into account the public hearing and comments that were received, the EPA formally selected a remedy

based on the full administrative record, and issued a document known as the Record of Decision. The Record of Decision serves essentially as a blueprint for the cleanup process. *See* https://www.epa.gov/superfund/record-decision-rod-guidance. Although the Record of Decision relates to the entirety of OU-1, to repeat, this case and the resulting consent decree only involve Zone 1 and Zone 3 of OU-1. [DE 2-1 at 10-11.]

On September 3, 2014, the United States and the State of Indiana filed a complaint in federal court against defendants Atlantic Richfield and Dupont and, on the same day, filed a Notice of Lodging of Proposed Consent Decree. The government published the proposed Consent Decree in the *Federal Register*, commencing the required 30-day period for public comments. On October 28, 2014, I held a hearing regarding the Consent Decree. [DE 10.] At the hearing, I was particularly interested in why Zone 2 was being excluded from the litigation and counsel for the government told me that the cleanup of Zone 2 would be handled in the "second phase" of the process. [DE 12 at 4.] I was satisfied that the Consent Decree was fair, reasonable and in the public interest so I approved it, entered judgment and the case was closed that day. [DE 8-1, 9.] Since entering judgment, the only action in this case has been the government's status report, filed in September 2016. [DE 11.]

Although the case has been closed, the cleanup efforts have been ongoing, though, as the applicants have alleged, not entirely smoothly. In July 2016, the East Chicago Housing Authority informed residents of the West Calumet Housing Complex that soil testing had revealed extremely high levels of contaminants in the soil. The East

Chicago Housing Authority decided to demolish the public housing complex, and it gave residents 60 to 90 days to move out. Since being notified of the East Chicago Housing Authority's plans, every resident of the housing complex has been relocated. This alarm bell, and other purported delays, prompted the applicants to file this motion to intervene on November 1, 2016. Magistrate Judge Cherry denied the motion, and the applicants objected, seeking review of that decision. I held an oral argument on the issue, in which I heard from the applicants and the government, as well as the original defendants, who agree with the government that intervention is not warranted.

## Discussion

There is an initial kerfuffle in this case as to what the proper standard of review is. The applicants cite 28 U.S.C. § 636(b)(1)(C), which provides that my review of a magistrate judge's proposed findings and recommendations of certain types of motions is *de novo*. But in this case, the Magistrate Judge's decision was not a proposed finding or recommendation. The types of motions subject to *de novo* review are specified in § 636(b)(1)(A), which allows district court judges to "designate a magistrate judge to hear and determine any pretrial matter pending before the court," except for what are essentially dispositive motions. Although a magistrate judge cannot be designated to hear and determine dispositive motions, a judge may designate a magistrate judge to issue proposed findings of fact and recommendations for the disposition of those motions. Those decisions are subject to *de novo* review by district judges.

5

Here, the motion to intervene decided by Magistrate Judge Cherry is not one of those specified motions that he wasn't permitted to "hear and determine." So § 636(b)(1)(A) seemingly applies, and therefore I "may reconsider any pretrial matter ... where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." Federal Rule of Civil Procedure 72 speaks more broadly than § 636(b)(1)(A). It says that Magistrate Judges cannot decide matters that are "dispositive of a party's claim." For starters, it is questionable whether a would-be intervenor is a "party" under Rule 72. On the other hand, certainly nothing could be more dispositive to the citizens who are trying to intervene in this case than being told by the Magistrate Judge that they can't. At least one district court has held that because a motion to intervene is a final appealable order, the District Court Judge's review of the Magistrate Judge's opinion must be *de novo*. *Ind. Petroleum Marketers & Convenience Store Ass'n v. Huskey*, 2014 WL 496825, at *2 (S.D. Ind. Feb. 6, 2014) (citing *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995)).

I will side-step the issue of whether the review is *de novo* or for clear error in this case because the standard of review does not affect the decision. Whether I am reviewing Judge Cherry's opinion *de novo* or under the clear error standard, my conclusion is the same. Intervention is improper under the facts of this case.

**Intervention**

Applicants seek to intervene in this matter via three avenues: Rules 24(a) and 24(b) of the Federal Rules of Civil Procedure and § 113(i) of CERCLA. Under Rule

6

24(a), applicants must demonstrate that: (1) the application is timely; (2) the applicants have an interest relating to the property or transaction that is the subject of the action; (3) the disposition of the action may impair or impede the applicants' ability to protect that interest; and (4) no existing party adequately represents the applicants' interest. Fed. R. Civ. P. 24(a); *Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 657 (7th Cir. 2013).

Section 113(i) of CERCLA provides a right to intervene in almost identical terms:

> [A]ny person may intervene as a matter of right when such person claims an interest relating to the subject of the action and is so situated that the disposition of the action may, as a practical matter, impair or impede the person's ability to protect that interest, unless the President or the State shows that the person's interest is adequately represented by existing parties.

42 U.S.C. § 9613(i). The only difference in these two provisions is that, under CERCLA, the burden for meeting the fourth factor – that no existing party adequately represents the applicants' interest – is the government's burden, not the applicants'. In the alternative, the applicants seek to intervene under Rule 24(b), which governs permissive intervention. Rule 24(b) provides that "[o]n a timely motion, the court may permit anyone to intervene who ... has a claim or defense that shares with the main action a common question of law or fact."

Both CERCLA and Rule 24 require that the application be timely, "a determination to be made from all the circumstances." *City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 824 F.2d 531, 534 (7th Cir. 1987). This is hardly a binary inquiry. Instead, as is true in a lot of areas of the law, it involves digesting various bits

of information and arriving at a reasonable conclusion based on things like "the length of time the intervenor knew or should have known of her or his interest in the case; the extent of the prejudice to the original litigating parties from the intervenor's delay; the extent of prejudice to the would-be intervenor if her or his motion is denied; and any usual circumstances." *Id.* (quoting *United States v. Kemper Money Mkt. Fund, Inc.*, 704 F.2d 389 (7th Cir. 1983)). As this quote from the Seventh Circuit suggests, it's a rather fuzzy inquiry.

The Magistrate Judge found that the motion to intervene was not timely because the applicants first learned of their interest in this matter in July 2012, when they received notice of the proposed cleanup plan prior to a public meeting. They had further notice of the Consent Decree and this litigation in September 2014, when the Consent Decree was published in the *Federal Register*, the EPA and Department of Justice issued a press release summarizing the Consent Decree, a copy was mailed to residents, and a local newspaper ran an article about the Consent Decree. The Magistrate Judge also analyzed the prejudice to the applicants and the existing parties and found that both weighed in favor of finding the motion untimely. Lastly, the Magistrate Judge found that no unusual circumstances outweighed the other timeliness factors.

The applicants raise four objections to the Magistrate Judge's conclusions. They argue that the opinion starts the timeliness clock with notices that pre-date the actual lawsuit by two years; the opinion misconstrues the actual prejudice to the existing

8

parties; the opinion conflates the "prejudice to the applicants" factor with the "length of time the applicants knew of their interest" factor; and finally that unusual circumstances warrant intervention at this time. I disagree. Applying the less deferential *de novo* standard of review, I independently find that the Magistrate Judge's conclusions are correct.

First, this case had been closed for more than two years when the applicants sought to intervene. Prior to the filing of the complaint, the EPA engaged in extensive efforts to inform the citizens of the affected areas about the hazards and clean up and to solicit public comments since at least 2012. In July 2012, the EPA announced its proposed plan for the cleanup of the site and held a public meeting on July 25, 2012. The EPA advertised the public meeting in local English and Spanish-language newspapers and kept a copy of the proposed plan at the public library. [DE 24-4 at 12.] Even more to the point, before the meeting, the EPA mailed to every resident living within two miles of the Site a copy of the proposed plan. At the meeting, 42 people attended, including 15 residents, the East Chicago Mayor, and local news organizations. [DE 24-4 at 12.] Those in attendance provided oral comments on the proposed plan. The EPA also received written comments from both private citizens and parties that were potentially financially responsible for the cleanup. [DE 24-2 at 10-11.]

All of the public outreach described above occurred before this case was initiated. But considerable outreach has taken place since as well. The complaint in this case was filed September 3, 2014. [DE 1.] On the same day, the government also filed

the proposed Consent Decree. [DE 2.] Notice of the lodging of the Consent Decree was published in the publicly available *Federal Register*, 79 Fed. Reg. 53,447 (Sept. 9, 2014). [DE 4 at 2-3.] Moreover, the EPA and the Department of Justice issued a press release summarizing the substance of the Consent Decree, and a local newspaper ran an article about the Consent Decree. [DE 24-2 at 15, 98-100, 101-03.] After I accepted the parties' Consent Decree, there were two additional public information sessions held to discuss the cleanup activities. [DE 24-4 at 14.] Since that time, the EPA has engaged with residents as part of their efforts to test and clean up the contamination. [*See generally* DE 24-4 at 14-16.]

The applicants raise a few issues with the Magistrate Judge's conclusions on this point: they attack the form of notice; they fault the Magistrate Judge for starting the clock two years too early; and they claim that the severity of the problem just became known to them. As to the form of notice, they argue that most residents disregarded these public mailings and announcements and that the publication of the Consent Decree via publication in the *Federal Register*, the EPA's press release, and one newspaper is too remote. To which I ask, what more could have been done by way of notice? Short of going door to door and personally telling each resident about the environmental hazard and the proposed remediation plan, it is difficult to imagine more effective notice. So I can't be as dismissive of the EPA's efforts as the applicants are: mailed notices, public meetings, and public court filings were sufficient in this case to put the applicants on notice that their rights might be impaired, especially

10

considering that several residents did submit comments on the proposed plan and attended the July 25, 2012 public meeting. [DE 24-2 at 10.]

Applicants also argue that it was not until recently that they learned of the severity of the contamination at their particular properties. But the precise nature of the impact to their interests isn't what matters. Instead, my inquiry turns on how long the applicants knew or should have known that the litigation could impact their interests. *See Heartwood, Inc. v. U.S. Forest Serv., Inc.*, 316 F.3d 694, 701 (7th Cir. 2003) ("A prospective intervenor must move promptly to intervene as soon as it knows or has reason to know that its interests *might be* adversely affected by the outcome of the litigation.") (emphasis added). In other words, it isn't about how bad the impact is; it's about whether there might be an adverse impact at all.

The applicants also argue that the Magistrate Judge's opinion starts the timeliness clock before the litigation even began. But this argument ignores the Magistrate Judge's next conclusion: the applicants had notice that their rights might be impaired by this litigation when the proposed Consent Decree was filed with the Court, published in the *Federal Register*, and summarized in EPA and Department of Justice press releases, and again when the final Consent Decree was accepted, mailed to residents, and discussed in the local newspaper. Yet, they still waited two years to intervene.

I will admit that pointing to the citizens' lack of timely action seems a bit unfair. The irony of the situation is not lost on me. The defendants in this case (or their

predecessor companies) polluted the areas in East Chicago going all the way back to the year 1900. What's more, the EPA has known of the environmental harm in the affected areas for *several decades* but only relatively recently took action to begin to ameliorate the problem. For the citizens to now be told that they are the ones that are too late is probably a little hard to swallow. But for better or worse, the case law regarding intervention is clear, and the constraints that apply to would-be intervenors simply are not the same as those that apply to the government in addressing environmental issues. Therefore, given the lengthy delay, this factor weighs heavily in favor of finding the motion untimely.

The prejudice to the original litigating parties also favors finding the motion untimely. The EPA and the defendants have been operating under the Consent Decree in this case for well over three years. They have settled expectations. This timeliness factor "insures that existing parties to the litigation are not prejudiced by the failure of would-be intervenors to act in a timely fashion." *City of Bloomington*, 824 F.2d at 535 (quoting *Garrity v. Gallen*, 697 F.2d 452, 455 (1st Cir. 1983)). The Magistrate Judge found that intervention here would be highly prejudicial to the existing parties, who have already "negotiated, settled, and obtained judgment in this case." Magistrate Judge Op. at 6. The Magistrate Judge further found that intervention could potentially endanger public health by delaying the EPA's cleanup process. *Id.* at 6-7.

Here, the parties engaged in extensive negotiations to finalize the Consent Decree, which is both complex and comprehensive. Final judgment has been entered,

12

and the case has been closed for three years. The EPA has already begun its cleanup activities, including taking thousands of samples from residences' yards and cleaning properties, and the defendants have already made substantial payments in funding these activities. Under similar circumstances, where a settlement had already been reached months or years prior, courts have had no trouble concluding that motions to intervene were untimely. *See, e.g.*, *NAACP v. New York*, 413 U.S. 345, 367 (1973) (motion to intervene filed three months after the suit had been initiated, and after a motion for summary judgment, was untimely); *City of Bloomington*, 824 F.2d at 535 (eleven-month delay "clearly establishes" the motion was untimely); *United Nuclear Corp. v. Cannon*, 696 F.2d 141 (1st Cir. 1982) (seven and a half months was untimely).

It is also a little hard to conceive what intervention at this point would look like. For example, what precisely would the EPA have to do to satisfy the interests of the intervenors? There are thousands of residents in the affected areas. What if they are demanding different approaches to an issue? Adding to the prejudice component, intervention would result in additional burdens being placed on the government, including the requirement to provide the intervenors with progress reports, endowing the intervenors with alternative dispute resolution rights under the Consent Decree, and providing a mechanism to enforce a settlement that they did not negotiate.

Moreover, as the Magistrate Judge correctly found, there would be little, if any, prejudice to the intervenors at this point in the litigation because they have had ample opportunity to provide input in this matter. As previously explained, notice of the

13

lodging of the Consent Decree was published in the *Federal Register*, providing a thirty-day period in which members of the public, including the applicants, could submit comments. [DE 4 at 2-3.] Several public meetings were also held in which members of the public could raise their concerns. The applicants continue to have other avenues available to them in order to have their voices heard, whether through Community Advisory Groups or direct contact with EPA employees. Indeed, the government has substantially increased its outreach to the community affected by the cleanup efforts. [DE 53 at 24.]

The applicants claim that the Magistrate Judge conflated this analysis with the length of time they knew of their interest in the matter. I discern no such mistake. Rather, the prior opportunities to submit their views to the court and to the government, and the future opportunities to do so, are what persuade me to find that there would be no prejudice to the applicants. *See City of Bloomington*, 824 F.2d at 537 (finding that there was no prejudice to the would-be intervenors because they had already been afforded an opportunity to present their views to the court).

The applicants also point to several "unusual circumstances" that they argue support finding the motion is timely. This factor allows would-be intervenors to advance a convincing justification for their tardiness that could militate in favor of finding the motion timely. *See id.* First, the applicants claim that the notices were inadequate as written and that the notices did not capture the extent or severity of the contamination at the site. But this is a Superfund site. By the very nature of this

designation, the extent of the contamination is severe. The fact that it may be *more severe* than first thought doesn't change the analysis. As previously explained, I do not believe that the notices were inadequate. And in any event, as I see it, the timeliness clock starts when the applicants learn their interests might be impaired – not when they learn how severely. The applicants argue that they are part of an environmental justice community that the EPA failed to protect. Although the applicants are part of an environmental justice community, they point to no case law suggesting that this fact is enough to overcome the other considerations.

Finally, the applicants point to the status report filed on September 2, 2016, which indicates that the EPA is reexamining the chosen remedy for Zone 1, the area where the East Chicago Housing Authority previously had a public housing complex. [DE 11 at 3-4.] As noted above, the residents have already been relocated from the housing complex and the housing authority plans on demolishing it. It is true that this change in circumstances may lead to the Record of Decision being modified and so too the Consent Decree. Under the terms of the Consent Decree, material modifications must be agreed to by the United States and the settling defendants and "shall be effective upon approval by the Court." [DE 8 at 56.] Thus, any modification that "fundamentally alters the basic features of the selected remedy," i.e., a material modification, requires the government to seek and obtain my approval. The EPA has also represented that any material modification would have to go through notice and comment before becoming effective. *See generally* 42 U.S.C. §§ 9622(d)(2), 9617(a)

(requiring notice and comment "before adoption of any plan for remedial action" under CERCLA). The government confirmed that the situation affecting the East Chicago Housing Authority complex will likely present a material modification of the selected remedy, which would require the government to request approval from this Court. [DE 53 at 47-48.]

At oral argument, I asked the government lawyer whether, if a major modification to the Consent Decree occurred and required court approval, would the applicants be given another opportunity to intervene at that time. The lawyer replied that it would and even conceded that government's timeliness argument would likely go out the window in that circumstance. [DE 53 at 53.] That's not to say that intervention would necessarily be proper at that time. The government would still be able to contend that they are adequately representing the interests of the would-be intervenors and that intervention, even at that time, might run head long into CERCLA § 113(h) which prohibits intervention while the remediation is ongoing. *See* 42 U.S.C. § 9613(h); *see also Pollack v. U.S. Dep't of Def.*, 507 F.3d 522, 525 (7th Cir. 2007) ("[C]ourts generally may not review challenges to CERCLA cleanup efforts ... but they may review such challenges when brought in citizen suits-so long as the citizen litigants wait until the cleanup is done before suing."). All of this is neither here nor there at this point because, as Magistrate Judge Cherry observed, there is no pending request to modify the Consent Decree, and the mere chance that it may be modified is not enough to warrant overriding the other three factors that weigh so heavily in favor of

untimeliness. So I will cross that bridge when we get there. If a major modification is done to the Record of Decision and the parties seek to modify the Consent Decree as a result, then I can consider an intervention motion at that time anew.

The applicants are understandably frustrated with the slow pace at which the cleanup process has occurred. The government has known about these risks for a long, long time. But the government and the defendants have been in agreement on the remedy for over three years at this point. I agree with the Magistrate Judge that the applicants' motion to intervene is untimely. Because the motion is untimely, the applicants' motion to intervene under Rule 24(a), Rule 24(b), or CERCLA must be denied. *People Who Care v. Rockford Bd. of Ed.*, 68 F.3d 172, 179 (7th Cir. 1995) (an untimely motion to intervene must be denied). Although their motion to intervene is denied, I am optimistic that the residents of East Chicago will have their voices heard and their input considered, since the government represented to this Court that its "door remains open." [DE 24 at 9.]

Based on the foregoing, the Court **DENIES** the applicants' Motion to Intervene [DE 15]. The Magistrate Judge's Opinion [DE 34] is **AFFIRMED**, and the applicants' objection to the Magistrate Judge's Opinion and Order [DE 35] is **DENIED**.

SO ORDERED.

ENTERED: February 9, 2018.

/s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT





Referred to in 1.16.2018 Oral Argument